UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

STEVEN KACHIGIAN,                          :
                                           :        Civil Action No. 09-6217 (DEA)
            Plaintiff,                     :
                                           :
      v.                                   :        OPINION
                                           :
BERKSHIRE LIFE INSURANCE COMPANY           :
OF AMERICA, and THE GUARDIAN LIFE          :
INSURANCE COMPANY OF AMERICA,              :
NEW YORK, NEW YORK,                        :
                                           :
            Defendants.                    :
_____ :

     This matter comes before the Court on a series of motions *in limine* by Plaintiff Steven

Kachigian ("Plaintiff" or "Mr. Kachigian") and Defendant Berkshire Life Insurance Company of

America ("Defendant" or "Berkshire"). Specifically, Defendant filed motions *in limine* (1) for an

order dismissing the Complaint or, alternatively, either barring Plaintiff from presenting

evidence that a material and substantial duty of his occupation was physically carrying a laser on

sales calls, or for a spoliation inference [dkt. no. 53]; (2) to preclude testimony by 10 new

witnesses as well as Plaintiff's experts, Dr. Jeffrey Lamb and Dr. David Miller [dkt. no. 54]; and

(3) to preclude Plaintiff from presenting any evidence that a material and substantial duty of his

pre-disability occupation included demonstrating the laser during sales marketing calls and

training physicians on the use of the laser [dkt. no. 52]. Plaintiff has opposed Defendant's

Motions [dkt. nos. 60, 61, 62].

     Plaintiff filed a motion *in limine* to exclude testimony of Defendant's experts, Robert O.

Cathcart and Ernest P. Smith [dkt. no. 51]. Defendant has opposed Plaintiff's Motion [dkt. no.

59].

The Court has considered the Parties' submissions pursuant to Fed R. Civ. P. 78 and, for the reasons set forth below, these motions are **GRANTED**, in part, and **DENIED**, in part.

## I.      INTRODUCTION & PROCEDURAL HISTORY[1]

This is a breach of contract action arising out of Defendant's denial of Plaintiff's claim for total disability benefits. On June 24, 2002, Berkshire issued a disability income policy ("the Policy") to Plaintiff. The Policy provides monthly disability benefits in the event of "total disability." "Total disability," as defined by the Policy, means "because of sickness or injury, you are not able to perform the material and substantial duties of your occupation." The Policy defines "your occupation" as "the regular occupation . . . in which you are engaged at the time you became disabled." The central issue in this case is whether Plaintiff is totally disabled, as defined by the Policy.

This action was initiated on December 8, 2009. On March 8, 2012, U.S. District Judge Peter G. Sheridan issued a Memorandum Opinion and Order denying Defendant's Motion for Summary Judgment. By Order dated November 11, 2012, this action was referred to U.S. Magistrate Judge Douglas E. Arpert to conduct all proceedings and order the entry of final judgment in accordance with 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.

## II.     SPOLIATION

In discovery, Defendant sought production of logs, appointment books, schedules and calendars (collectively, "logs") allegedly kept by Plaintiff that evidence his day-to-day activities at Cosmetic Laser Leasing ("CLL"). Defendant claims the logs are "the only proof that would substantiate or refute what Plaintiff claims to have done day-in and day-out" during the course of his employment with CLL. Def.'s Reply Br., dkt. no. 68, at 4. Because Defendant claims the logs

---

[1] As the facts of this case are well-known to the Parties, counsel and the Court, they will be set forth below only as they relate to the instant motions.

were never produced, it asks the Court to dismiss Plaintiff's claims, bar Plaintiff from presenting evidence that the material and substantial duties of his occupation required lifting and transporting the laser, or to issue an adverse inference instruction to the jury. In opposition, Plaintiff maintains that the logs were turned over to CLL as part of the Transfer of Ownership Agreement between Plaintiff and CLL.

### A.      Legal Standard

Spoliation is "'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd., 348 F. Supp. 2d 332, 335 (D.N.J. 2004) (citing Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004)). If a party engages in spoliation of evidence, the Court may issue appropriate sanctions.

The Third Circuit has adopted a four-part test for evaluating a spoliation claim. Spoliation occurs where: (1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party. Bull v. United Parcel Serv., Inc., 665 F.3d 68, 73 (3d Cir. 2012). The party who seeks a spoliation sanction bears the burden of proving these factors. See id. at 77.

The Court considers first whether spoliation occurred and, second, what (if any) sanctions are appropriate.

### B.      Whether Spoliation Occurred

Here, one of the spoliation factors is easily dealt with. There appears to be no dispute that the evidence in question was relevant. Indeed, the logs go to the heart of Mr. Kachigian's

claim—that carrying the laser on sales calls was a material and substantial part of his occupation. The other factors, however, require a greater analysis.

### 1.   Control

The Court begins with the notion that the logs were (at least at one time) unquestionably under Plaintiff's control. Mr. Kachigian admitted as much during his deposition. Kachigian Tr. 196:14-197:22. However, Plaintiff maintains that the duty to preserve did not arise until after logs had passed to CLL as part of the Transfer of Ownership Agreement. The Transfer of Ownership was fully effected on December 31, 2006. In the absence of any compelling evidence to the contrary, the Court accepts Mr. Kachigian's position that he surrendered the logs to CLL as part of the Transfer of Ownership Agreement. For this reason, and for the reasons more fully explained below, the Court also accepts Plaintiff's position that once he surrendered the logs, he no longer retained control over them. The primary issue then becomes, *when was the duty to preserve triggered*? Once that date is determined, the issue of actual suppression can be addressed.

### 2.   Duty

A party has a duty to preserve documents that it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation. Scott v. IBM Corp., 196 F.R.D. 233, 249 (D.N.J. 2000). The question of reasonable foreseeability is a "'flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry.'" Bull, 665 F.3d at 77-78 (citation omitted). Here, a brief recitation of the relevant dates and facts is necessary.

Plaintiff filed his initial claim for benefits with Berkshire on June 28, 2006. On July 11, 2006, in a telephone call with Berkshire's Lead Claims Consultant, Kevin Sherman, Plaintiff

4

offered to provide Berkshire with his schedule and appointment books. On July 24, 2006, Mr. Kachigian and Mr. Sherman again spoke by telephone. They agreed that Mr. Kachigian's present situation did not fit the Policy's definition of "total disability," as Mr. Kachigian was continuing to perform his occupational duties at CLL. During the call, Mr. Kachigian also indicated that he would pursue further medical treatment, including physical therapy, in hopes of continuing to work. Based on this conversation, Mr. Sherman and Mr. Kachigian agreed to close Mr. Kachigian's claim.

On November 2, 2006, Mr. Kachigian filed a second claim for benefits. Mr. Kachigian decided on this course of action after completing several months of physical therapy and consulting with his treating physician, Dr. Lamb. On November 9, 2006, Berkshire again requested copies of Plaintiff's schedules, appointments and any other documentation that would evidence Plaintiff's occupational duties and time spent performing those duties.[2]

The Transfer of Ownership was fully effected on December 31, 2006. By that time, Plaintiff relinquished control of the logs by turning them over to CLL.

Several months later, during a call on August 20, 2007, Plaintiff advised Berkshire that, if his claim was denied, he intended to pursue an appeal through the company, the Department of Insurance or, if necessary, litigation. On August 29, 2007 Berkshire denied Plaintiff's second claim based on the Policy's definition of "total disability."

After litigation was commenced, on May 18, 2010, Defendant served formal document requests seeking Plaintiff's logs. When Plaintiff responded that the logs had been turned over to his former business partner, Dr. Jerry Gertzman, Defendant served Dr. Gertzman with a Subpoena seeking the logs. Although Dr. Gertzman produced documents in response to that

---

[2] It appears that Mr. Sherman also requested copies of Mr. Kachigian's schedule and appointment books during a telephone call on November 3, 2006.

Subpoena, Defendant claims the logs were not produced or, to the extent they were produced, they were incomplete.

The operative timeframe here is December, 2006—i.e., the time when Plaintiff turned the logs over to CLL. At the time Plaintiff filed his second claim, in early-November, 2006, it was not "objectively foreseeable," Bull, 665 F.3d at 78, that his claim would be denied and future litigation would be likely. To the contrary, Plaintiff had every reason to believe his claim would be granted at that time. There is nothing in the record, moreover, to suggest Plaintiff's understanding would have changed between that date and the date when he turned the logs over to CLL on December 31, 2006. To be sure, the likely success of Plaintiff's claim deteriorated with each month that passed without progress. Therefore, it is likely the duty was triggered at some time before he explicitly threatened litigation in August, 2007. However, because the Court concludes the duty to preserve was not triggered until after the logs were transferred, it need not make a specific finding as to the triggering date.

### 3.   **Actual Suppression**

A "party's failure to produce a document can have the same practical effect as destroying it." Bull, 665 F.3d at 73. As a result, "under certain circumstances, nonproduction of evidence is rightfully characterized as spoliation." Id. "When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him." Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995) (citations omitted).

However, actual suppression requires more than ordinary negligence. Consequently, "a finding of bad faith is pivotal to a spoliation determination." Bull, 665 F.3d at 79. Thus, no

"unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." Brewer, 72 F.3d at 334. The Third Circuit has made it clear that withholding documents in bad faith, as is alleged here, requires a showing of intent. Bull, 665 F.3d at 79.

Here, Plaintiff does not claim the logs were accidentally lost or destroyed. Instead, Plaintiff maintains that the logs were transferred to CLL and, therefore, no longer his responsibility. At his deposition, Plaintiff testified that he turned over all logs to Dr. Gertzman as part of the Transfer of Ownership in December, 2006:

> Q:      Well, by June of 2005, let's take the first six months of 2005, what were you doing day in and day out?
>
> A:      Calling on physicians.
>
> Q       What proof would it be?
>
> A:      Logs.
>
> Q:      OK. So you had logs?
>
> A:      [Witness indicating]
> . . .
>
> Q:      And you have no evidence of [your job duties] in connection with this litigation that you've been able to produce, do you?
>
> A:      I stated I gave my records over to Dr. Gertzman at the time of the transfer of ownership [in December, 2006].

Kachigian Tr. 196:14-197:22. To be sure, there are strong public policy concerns that would not allow a party to shirk his responsibility by merely passing it off on another party or entity. Still, the record does not demonstrate any bad faith or intent on the part of Plaintiff to withhold the documents. Nor does it reflect any bad faith or intent on behalf of CLL or Dr. Gertzman. The

most plausible explanation is more benign. In the Court's view, it seems likely the logs were simply misplaced or lost after they were delivered to CLL. This position is underscored by the passage of time between when the records were turned over to CLL and when Defendant served its first request for production of documents, nearly four years later.

This is not to say a more prudent approach by Plaintiff might have been to retain copies for his personal records. Still, the Court is constrained by the Third Circuit's direction and, therefore, finds no actual suppression occurred. Since no spoliation occurred, there is no need to reach the issue of sanctions. Accordingly, Defendant's Motion *in limine* in this regard is **DENIED**.

## III.    EXPERTS

### A.    Legal Standard

District courts serve as the gatekeepers and must determine the reliability of proffered expert testimony. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 597 (1993). The objective of the district court's gatekeeping role "is to ensure the reliability and relevancy of expert testimony" and "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152 (1999). Nonetheless, "rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702, *Committee Notes on Rules—2000 Amendment*.

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.[3]

Rule 702 is generally understood to embody "a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). The party offering the proposed expert testimony bears the burden of establishing the admissibility of the testimony by a preponderance of the evidence. In re Human Tissue Products Liab. Litig., 582 F. Supp. 2d 644, 655 (D.N.J. 2008) (citing Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 417 (3d Cir. 1999)).

With these legal standards in mind, the Court turns to examining whether the parties have proved, by a preponderance of the evidence, the admissibility of their experts' conclusions.

**B.     Plaintiff's Motion to Exclude Defendant's Experts**

Plaintiff seeks to exclude Defendant's experts, Robert O. Cathcart and Ernest P. Smith. Mr. Cathcart is offered as an expert in the sale and marketing of medical devices. Mr. Cathcart is being offered to (a) assess Plaintiff's claims in support of his job functions, and (b) refute Plaintiff's position that carrying and transporting the laser was a material and substantial part of his occupation.

Mr. Smith is an accountant. Mr. Smith was retained by Defendant to analyze the financial and occupational aspects of Plaintiff's claim for disability benefits. Specifically, Mr. Smith was

---

[3] Although the language of Rule 702 was changed in 2011, the Advisory Committee Notes state the changes were "stylistic only" and thus do not reflect an "intent to change any result in any ruling on evidence admissibility." FED. R. EVID. 702, *Committee Notes on Rules—2011 Amendment*.

retained to review the books, records and tax returns of CLL and Plaintiff to ascertain what Plaintiff did while at CLL, the income attributable to the work performed by Plaintiff, and the financial performance and viability of CLL. Mr. Smith offers four conclusions in his report:

1. Plaintiff provided minimal occupational and business activity information to the Defendant in regards to his involvement with CLL.
2. Plaintiff's disability did not prevent him from earning revenue from his material and substantial duties at CLL.
3. Plaintiff did not develop an adequate business plan.
4. Prior to the onset of disability, Plaintiff's work experience did not demonstrate the sustainability of CLL as a profitable venture.

Del Mauro Decl. at Ex. 10 (Expert Witness Report of Ernest Patrick Smith).

### 1.     Qualification

Qualification refers to the requirement that the witness possess specialized expertise. Schneider, 320 F.3d at 404. The Third Circuit has interpreted this requirement "liberally" in holding that "a broad range of knowledge, skills, and training qualify as an expert." In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994); see also Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998); In re Human Tissue Products, 582 F. Supp. at 655.

#### i.     *Mr. Cathcart*

First, the Court believes Mr. Cathcart is qualified to testify as an expert in the sale and marketing of medical devices. Mr. Cathcart is a Senior Business Leader with Medical Devices and has 28 years of experience in marketing and selling medical devices to physicians, cardiologists and nurses. Cathcart Decl. at ¶ 1. Throughout his career, Mr. Cathcart has called on approximately 10,000 physicians, trained approximately 150 sales representatives and managed between 400 and 500 sales representatives. Id. at ¶¶ 13, 17. Even acknowledging Plaintiff's argument that Mr. Cathcart has never sold a laser comparable to the one at issue here, the Court

nonetheless believes Mr. Cathcart's qualifications satisfy the liberal requirements established by the Third Circuit. See Waldorf, 142 F.3d at 625.

### ii. *Mr. Smith*

Mr. Smith is also qualified to offer expert testimony, subject to the caveat regarding Mr. Smith's fourth conclusion described below. Mr. Smith has over 25 years of experience conducting forensic investigations for disability insurance claims in the medical industry. Smith Aff. at ¶¶ 17, 18. Mr. Smith holds professional certifications as a Certified Public Accountant and in Certified Financial Forensics, and is a Certified Valuation Analyst and Certified Fraud Examiner. Id. at ¶ 2. Mr. Smith's career has focused on internal auditing, investigative auditing, measurement of damages, business valuation and dispute resolution services. Id. at ¶ 14. Mr. Smith has also participated in over 1,000 investigations regarding, among other matters, business valuations. Id.

Regarding the aforementioned caveat, Plaintiff disputes Mr. Smith's qualifications as they relate to his fourth conclusion, that Plaintiff's work experience does not demonstrate that he would have the ability to maintain his position with CLL on a long-term basis. To be sure, it is questionable that a forensic accountant is qualified to offer a prognosis of one's occupational outlook as a traveling laser salesman in the medical industry. Still, the admissibility of Mr. Smith's fourth conclusion is best addressed in the context of 'fit,' as described below. Because the Court finds that Mr. Smith's proposed conclusion in this regard does not fit the issues of the case, the question of Mr. Smith's qualifications here is moot.

### 2. Reliability

In Daubert the Supreme Court set forth a non-exclusive checklist for trial courts to use in assessing the reliability of scientific expert testimony. These factors include: (1) whether the

expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. Daubert, 509 U.S. at 590-92.

Kumho addressed the applicability of Daubert to non-scientific experts. In non-scientific cases, such as here, the Daubert factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's expertise, and the subject of his testimony." Kumho, 526 U.S. at 150.   Thus, "the relevant reliability concerns may focus upon personal knowledge or experience."  Id. at 152. The objective of Daubert's gatekeeping role, however— "to ensure the reliability and relevancy of expert testimony"—remains unchanged. Id. In any case, the district court enjoys "considerable discretion" to "determine the criteria for judging reliability under the particular circumstances." Betterbox Communications Ltd. v. BB Technologies, Inc., 300 F.3d 325, 329 (3d Cir. 2002).

### i.    *Mr. Cathcart*

Mr. Cathcart's proposed testimony is reliable. In his report, Mr. Cathcart concludes that it is neither necessary nor essential to present or demonstrate the laser during sales calls in order to efficiently and successfully generate sales. In support of this conclusion, Mr. Cathcart relied on the laser's product manual as well as the deposition testimony of Plaintiff, Brian McNamara, Richard Alberalla and Dr. Gertzman. Mr. Catchart also relied on his 28 years of experience in selling and marketing medical devices.

Mr. Cathcart's conclusions flow logically from his experience in the field and are likewise based on relevant documents and information from this case. That Mr. Cathcart has no

direct experience marketing an equivalent laser device, as Plaintiff points out, is not dispositive. The circumstances in this case are undoubtedly unique. As a result, Mr. Catchart's experience marketing medical devices need not be identical to Plaintiff's in every way. It is enough that Mr. Cathcart's experience is functionally equivalent. Thus, under the circumstances of this case, Mr. Catchart's proposed testimony is reliable. Mr. Cathcart may testify as to generally accepted methods in the medical sales industry as they are routinely applied and practiced.

### ii.   *Mr. Smith*

Plaintiff's argument appears to attack Mr. Smith's qualifications and whether his expert opinions 'fit' the case at hand. Therefore, the Court need not address the reliability requirement other than to note that a comprehensive review of Mr. Smith's expert report and qualifications suggests that his conclusions (to the extent they are allowed by the Court) are reliable.

### 3.   Fit

Finally, the Court must evaluate whether the experts' proffered testimony "fit the issues in the case." Schneider, 320 F.3d at 404. "'Fit' in the context of Rule 702 refers to the helpfulness of the expert's testimony in assisting the trier of fact." In re Human Tissue Products, 582 F. Supp. 2d at 657. Said differently, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404.

The Parties' main point of contention with regard to Defendant's experts appears to revolve around whether their testimony fits the issues of the case. In order to resolve this dispute, it is necessary to briefly construe the contested issue in this case (i.e., *Whether carrying the laser on sales calls was a material and substantial duty of Mr. Kachigian's occupation*).

Neither side contends the language of the Policy is ambiguous. The Court will therefore give effect to the plain meaning of the policy language. Kachigian v. Berkshire Life Ins. Co. of

Am., 2012 WL 762486, at *3 (D.N.J. Mar. 8, 2012) (Sheridan, J.) (Opinion denying Berkshire's motion for summary judgment). The plain meaning of the Policy requires Plaintiff to demonstrate: because of sickness or injury, he was not able to perform the material and substantial duties of his occupation. "A duty is 'material' when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the 'regular occupation.'" Kaelin v. Tenet Employee Benefit Plan, 405 F. Supp. 2d 562, 582 (E.D. Pa. 2005). Defendant retained its experts in large part to contest Plaintiff's position that carrying the laser was a material and substantial aspect of his job.

### i.    *Mr. Cathcart*

First, Mr. Cathcart's report purports to "assess Plaintiff's claims that the only way to effectively and profitably market and sell leases for the laser was for him to lift, transport and demonstrate the laser on in-person sales visits." Def.'s Opp. Br., dkt. no. 59, at 19. Plaintiff believes Mr. Cathcart's proposed testimony impermissibly undermines his autonomy to choose how to best perform his occupational duties.  Based on his experience and corresponding report, however, the Court concludes that Mr. Catchcart's proffered testimony fits the issues of the case.

Mr. Cathcart's testimony is directly relevant to the primary issue in the case. And the jury may find it helpful to understand the dynamics of Mr. Kachigian's occupation and field from an individual who has extensive experience as a medical salesperson. While Plaintiff's concerns are not lost on the Court, it is nonetheless "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" that are "the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 595. That is to say, the jury is free to discredit Mr. Cathcart's testimony or accord it whatever weight it deems

appropriate. Accordingly, Plaintiff's motion *in limine* to bar the testimony of Mr. Catchart is **DENIED**.

### ii.    *Mr. Smith*

Mr. Smith's report offers four conclusions. See supra p. 10. Plaintiff argues that Mr. Smith opines "well outside the realm of his expertise" and, further, that many of Mr. Smith's purported conclusions do not require expert testimony. Pl.'s Br., dkt. no. 51, at 24. The Court will address each of Mr. Smith's proposed conclusions.

Mr. Smith's first and second conclusions are closely tied. Both purport to analyze the data presented in order evaluate how Mr. Kachigian allocated his time while at CLL. As such, much of Mr. Smith's analysis here fits the issues in this case.

As to Mr. Smith's first conclusion, however, there appears to be a disconnect between the words Mr. Smith chose to phrase his conclusion and the analysis that supports it. While the conclusion itself—that Plaintiff provided minimal occupational and business activity information to the Defendant in regard to his involvement with CLL—is problematic, much of the analysis fits the issues of this case. For example, it is acceptable for Mr. Smith to analyze CLL's cash flows and Plaintiff's calendars in order to reach a conclusion as to the amount of time Plaintiff spent transporting the laser. It is similarly appropriate for Mr. Smith to translate this data into the amount of time he believes Plaintiff spent performing other tasks, such as management duties. Both of these findings address Plaintiff's material and substantial duties.

What is not appropriate, however, is Mr. Smith's bare conclusion that Plaintiff has provided insufficient data regarding his occupational activities. That is a question of fact and credibility for the jury to weigh. Thus, Plaintiff's motion *in limine* with regard to Mr. Smith's first conclusion is **GRANTED** in this regard only, and **DENIED** in all other respects. Mr. Smith

may still present his conclusions; indeed, he may even testify that, in his view, the limited nature of the data available made it difficult to conduct his analysis. What he may not do, however, is tell the jury in conclusory fashion that Plaintiff's submissions in this regard were somehow fatally deficient.

Mr. Smith's second conclusion, that Plaintiff's disability did not prevent him from earning revenue from his material and substantial duties at CLL, also fits the issues of the case. Plaintiff argues that Mr. Smith's second conclusion is purely a question of fact, to be determined by the jury. Plaintiff is correct that the issue of Mr. Kachigian's earnings is a question of fact; however, this does not mean an expert in forensic accounting could not assist the jury. Mr. Smith examined Plaintiff's pre- and post-disability income in order to assess whether that information supported Plaintiff's claim that carrying the laser was a material and substantial aspect of Plaintiff's occupation. Courts frequently rely on this type of analysis when determining whether a given occupational duty was material and substantial. See, e.g., Lasser v. Reliance Standard Life Ins. Co., 344 F.3d 381, 387 (3d Cir. 2003) (finding diminution in income controlling). It is appropriate, then, that the jury be allowed to hear testimony on this issue from Mr. Smith. Thus, Plaintiff's *motion in limine* with regard to Mr. Smith's second conclusion is **DENIED**.

Next, Mr. Smith's third and fourth conclusions do not fit the issues of the case. Both conclusions focus on the viability of Plaintiff's employer—a point that, even if true, is not relevant to the functions of Plaintiff's occupation.

With regard to his third conclusion, that Plaintiff did not develop an adequate business plan, Mr. Smith's testimony is apparently offered to rebut Plaintiff's position that CLL failed because Plaintiff could not lift and transport the laser. Regardless of whether or not Plaintiff called this issue into question, it is not relevant. See Pl.'s Br., dkt. no. 51, at 25 (Mr. Smith's

16

fourth conclusion "has no relevance to the facts and/or issues to be decided in this case"). Thus, Plaintiff's motion *in limine* with regard to Mr. Smith's third conclusion is **GRANTED** and Mr. Smith's trial testimony will be limited accordingly.

Finally, Defendant fails to identify how Mr. Smith's fourth conclusion—that prior to the onset of disability, Plaintiff's work experience did not demonstrate the sustainability of CLL as a profitable venture—is relevant to the case. Whether CLL was a sustainable enterprise has no bearing on whether carrying and transporting the laser was a material and substantial part of Plaintiff's occupation. Nor does it bear upon any other element Plaintiff must prove in this case. Thus, Plaintiff's motion *in limine* with regard to Mr. Smith's fourth conclusion is **GRANTED** and Mr. Smith's testimony will be limited accordingly.

### C.     Defendant's Motion to Exclude Plaintiff's Experts & New Witnesses

Defendant seeks an *in limine* ruling barring, in whole or in part, testimony of persons identified by Plaintiff for the first time in the proposed Final Pre-Trial Order ("FPTO").[4] Defendant's original Motion sought to bar the testimony of eight "new" fact witnesses and two expert witnesses. Plaintiff's counsel has since certified that Plaintiff will not call the eight fact witnesses at trial. A. McHugh Cert., dkt. no. 60-1, at ¶ 2. Thus, this portion of Defendant's Motion is **DENIED** as moot. As to the expert witnesses, Defendant's Motion seeks to bar the testimony of Plaintiff's treating physicians, Dr. Lamb and Dr. Miller.

### 1.     Dr. Lamb

The Parties appear to have reached an agreement as to Dr. Lamb. Plaintiff's counsel's Certification states, "if Plaintiff decides to call Dr. Lamb it will be strictly as a treating physician." A. McHugh Cert. at ¶ 16. Defendant now seeks an order confirming as much.

---

[4] In anticipation of these motions *in limine*, and with the agreement of counsel, the proposed FPTO has not yet been filed.

Accordingly, with respect to Dr. Lamb, Defendant's Motion is **GRANTED** as to any purported expert testimony. If called to testify, Dr. Lamb must testify as a treating physician only, and may not offer any expert opinions regarding the material and substantial duties of Plaintiff's occupation. Nor may Dr. Lamb offer testimony as to causation or prognosis. Dr. Lamb's testimony must be limited to the factual observations he derived from treating Mr. Kachigian. See Damiani v. Momme, 2012 WL 1657920, at *4 (E.D. Pa. May 11, 2012) (Plaintiff's "doctors are free to testify as to Plaintiff's statements to them during their care and treatment; as to their own examination, diagnosis, and treatment of Plaintiff; and as to Plaintiff's prognosis based on their observations during treatment. What these treating physicians may not do is offer independent opinions as to the cause of Plaintiff's injuries.").

## 2.    Dr. Miller

Defendant argues that Dr. Miller's purported expert testimony should be barred for two reasons: (1) Plaintiff violated the disclosure requirements of FED. R. CIV. P. 26(a)(1) and 26(a)(2), and (2) even if the Court finds Dr. Miller was properly identified as an expert, his testimony is nonetheless inadmissible as a 'net opinion.'

As to Defendant's first argument, the Court believes Plaintiff has satisfied the disclosure requirements of Rule 26(a). Plaintiff identified Dr. Miller as a person with knowledge of relevant facts in his initial Rule 26 disclosures on April 15, 2010. On August 3, 2010, Dr. Miller was also identified by Plaintiff in his answers to Defendant's interrogatories. Similarly, on August 10, 2010, in response to Defendant's Document Request No. 30 for all "[w]ritten expert report[s] prepared by all expert witnesses who you intend to call as a witness in the trial of this matter," Plaintiff responded by referring Defendant to all treating doctors, including Dr. Miller. Plaintiff also identified all medical records provided in his answers to interrogatories. Plaintiff later

supplemented his answers to interrogatories when he sent a copy of Dr. Miller's report on January 10, 2011. Defendant also had a copy of Dr. Miller's CV as of March 11, 2011. Finally, Dr. Miller's deposition was taken on November 7, 2012. Given the above, Defendant cannot now claim that it was unaware of Dr. Miller's status as both a treating physician and an expert upon whom Plaintiff intended to rely on at trial.

Defendant's second argument is an attack on the substance of Dr. Miller's testimony as opposed to his actual qualifications. The 'net opinion' rule is neither an evidentiary rule under the Federal Rules of Evidence nor a factor in the Daubert analysis; instead, it is simply a restatement of the well-settled principle that "an expert's bare conclusions, unsupported by factual evidence, [are] inadmissible." Buckelew v. Grossbard, 87 N.J. 512, 524, (1981). Thus, the net opinion rule "requires the expert to give the 'why and wherefore' of the opinion, rather than a mere conclusion." Curtis v. Besam Group, 2008 WL 1732956, at *6 (D.N.J. Apr. 10, 2008).

In this case, the Court will preclude Dr. Miller from offering any expert opinion as to Plaintiff's "required" occupational duties. Defendant takes issue with Dr. Miller's proposed testimony regarding Plaintiff's ability to continue working in his previous profession. Indeed, on page 2 of Dr. Miller's report, he states:

> Final disposition: It is within a reasonable degree of medical probability that Mr. Kachigian was unable to continue working in his *previous profession as a salesman of cosmetic laser machines which required him to lift these machines on a regular basis.*

A. McHugh Cert. at ¶ 10 (Exhibit G) (Expert Report of Dr. Miller) (emphasis added). Dr. Miller's conclusions here go too far. First, it is difficult to see how a description of Plaintiff's job responsibilities could be derived from the factual evidence available to Dr. Miller as a treating physician. Perhaps more importantly, however, Dr. Miller's testimony goes to the ultimate issue

19

in the case to be decided by the jury: whether Plaintiff was required to lift the laser on a regular basis as part of his job duties. Accordingly, Defendant's Motion is **GRANTED**, in part, and **DENIED**, in part. Dr. Miller may testify as a medical expert. He may not, however, offer an opinion regarding the material and substantial aspects of Plaintiff's occupation.

## IV.    UNATHORIZED PRACTICE OF MEDICINE

Defendant seeks an *in limine* ruling barring Plaintiff from presenting evidence or testimony, or arguing to the jury, that a material and substantial duty of his occupation included demonstrating the laser hair removal device on himself during sales marketing visits with prospective customers. Defendant argues that Plaintiff's actions in demonstrating the machine on himself constituted the unauthorized practice of medicine. If this were the case, so goes the argument, Plaintiff's disability with regard to this activity would be legal—not factual—in nature. Since legal disabilities are not covered by the Policy, Defendant argues, Plaintiff should not be allowed to present evidence or otherwise testify to his actions in this regard.

### A.    Unauthorized practice of medicine

In New Jersey, the "practice of medicine or surgery" is defined as "the practice of any branch of medicine and/or surgery, and any method of treatment of human ailment, disease, pain, injury, deformity, mental or physical condition" N.J.S.A. § 45:9-5.1. The New Jersey Board of Medical Examiners has determined that laser hair removal constitutes the practice of medicine. See N.J.A.C. § 13:35-4A.3 ("'Surgery' means a manual or operative procedure, including the use of lasers . . . ."); N.J.A.C. § 13:35-12.2 (Definition of 'electrology' "specifically excludes laser and other intense light source hair removal"); N.J.A.C. § 13:28-2.15 (Prohibiting cosmetologists from performing or offering to perform "any service that has been determined by the New Jersey State Board of Medical Examiners to be a medical service," including "laser hair removal"); see

also Vivat, NJ State Boards of Medical Examiners and Cosmetology and Hairstyling, Admin. Consent Order, Lic. No. WG01881200 (Jul. 22, 2011) (reprimanding respondent for unauthorized practice of medicine when she performed laser hair removal without license). Pennsylvania has likewise determined that laser hair removal constitutes the unauthorized practice of medicine. See Charleston v. Salon Secrets Day Spa, Inc., 2011 WL 1562247, at *4-5 (E.D. Pa. Apr. 25, 2011) (acknowledging laser hair removal device could not be used without medical supervision).

In this case, Plaintiff admits that he demonstrated the laser on himself. Plaintiff does not appear to dispute that performing laser hair removal, in general, requires a medical license. Plaintiff argues, instead, that the unauthorized practice of medicine does not occur when one practices medicine on oneself (as opposed to another individual).

### B.    Legal disability

One who is prevented from performing his or her normal occupation because of some act of law is deemed "legally" disabled. "Disability insurance policies generally provide coverage for factual disabilities, such as injury or sickness, and not for legal disabilities." New York Life Ins. Co. v. Daly, 2001 WL 1231736, at *4 (E.D. Pa. Oct. 10, 2001); accord Massachusetts Mut. Life Ins. Co. v. Millstein, 129 F.3d 688, 691 (2d Cir. 1997) (Plaintiff's loss of income was due to unlawful conduct, not physical inability to perform occupational duties); Goomar v. Centennial Life Ins. Co., 855 F. Supp. 319, 326 (S.D. Cal. 1994), aff'd sub nom., 76 F.3d 1059 (9th Cir. 1996) ("Plaintiff's inability to practice his regular occupation [medicine] is due to his license revocation rather than sickness or injury.").

Here, Plaintiff alleges that transporting the laser was a material and substantial part of his job duties because, *inter alia*, he needed to demonstrate the laser or otherwise instruct physicians

on its use. However, as discussed above, Plaintiff's activities in this regard may amount to unauthorized practice of medicine. If this were the case, Plaintiff's inability to perform them would rightly be characterized as a legal disability, not covered by the Policy. However, based on the evidence submitted and authority cited, the Court is unable to conclude as a matter of law that using the laser on himself constituted the unauthorized practice of medicine or that Plaintiff's prohibitions in this regard amounted to a legal disability. Thus, Defendant's Motion is **DENIED**.

An appropriate Order follows.


**s/ Douglas E. Arpert**\
**DOUGLAS E. ARPERT, U.S.M.J.**

Dated: April 1, 2013

22